Ina May McADAMS et vir, Appellants,

v.

Londa Pickett OGLETREE et al., Appellees.

No. 6386.

Court of Civil Appeals of Texas.

Beaumont.

May 11, 1961.

Rehearing Denied June 7, 1961.

Powell, Rauhut, McGinnis, Reavley & Lochridge, Austin, Hightower & Willis,

Livingston, Darden & Fowler, Conroe, for appellants.

Hardy Hollers, Austin, Campbell & Foreman, Livingston, P. R. Rowe, Houston, for appellees.

McNEILL, Justice.

This litigation was started by two suits filed in 1958. The first was by appellee Londa Pickett Ogletree seeking to recover title to an undivided interest of 5.79 percent in large bodies of land in Polk and San Jacinto Counties and an undivided interest of 4.82 percent in considerable acreage in California, against her daughter, Ina May McAdams and husband, Kelly McAdams. The other action was by appellants Ina May McAdams, et vir, against Mrs. Ogletree and appellant Ina May McAdams' brother, Ben Ogletree, a resident of Polk County, and her sisters, Louise McElroy and husband, Billy McElroy, and Georgia Ribar and husband, Fred J. Ribar, seeking recovery of the same undivided interests of land, for partition thereof and for accounting. The two actions were consolidated, appellees Mrs. Ogletree, her son and two daughters and husbands taking the position of plaintiffs and the daughter, Ina May McAdams and husband, as defendants. Before trial the judge severed the question of title from the remaining questions, the issue of title was then tried and this appeal springs therefrom. The Ogletree children will sometimes be referred to herein by their first names.

A brief background will aid in understanding this litigation. G. R. Ogletree married Londa Pickett Ogletree in 1905 and the marriage existed until his death in 1949, and the children above named are the offspring of this marriage. In 1936, G. R. Ogletree owned and operated the Ogletree Lumber Company in Polk County. This property was community property between him and his wife. In that year he gave his son Ben a ⅓rd interest in the business thus constituting him a partner therein. Several times between 1936 and 1949 Ogletree, Sr., and wife made gifts of small percents in the lumber business to their son Ben and their three daughters so that just prior to the events involving the present controversy in 1949 each child held, as gift, 6½ percent in the business. Although much of the assets of said business constituted real estate, practically all of which stood in the name of the company, no formal conveyance appears to have been made as to any such interest.

For something more than a year previous to 1949, G. R. Ogletree was in considerable financial difficulties. While the lumber company owned thousands of acres of land in Polk and San Jacinto Counties and a considerable amount in California, Mr. Ogletree had extended his credit to associated businesses that did not develop well and his endorsements on these obligations were considerable. He was well along in age and his health for the last year of his life was very bad. He was worried about his affairs and dying leaving considerable estate taxes to be paid, and after talking with his wife and children he decided that he and his wife should make a deed to the remaining interest of 40⅗ percent in the company to the four children, and they would assume indebtedness owed by G. R. Ogletree in the amount of $159,818 and execute their several unsecured notes totaling $100,000 to grantors. It seems that at this time and for a period before the transaction their daughter, Louise McElroy, was acting as her father's secretary and the record reflects that the deed carrying out the trade was written by the daughters Louise McElroy and Ina May McAdams, although the latter denied that she ever saw the deed until about the time of her father's death in June, 1949. It is a lengthy instrument, copying in detail the many tracts of land involved. It recited conveyances of all the right, title and interest of the grantors in the properties for a consideration of $10 and other valuable consideration, and contained a general warranty. It specified that 40 percent of the interest conveyed was to Ben and 20 percent to each of the three

daughters; although Ben later gave each sister a percentage so that each of the four children would hold equal interest under the deed. The basic contentions of the parties arise from the execution of this deed. Appellees contend that by the agreement of purchase the children bought only the father's one-half community interest, and the other one-half or 20⅓ was conveyed in trust to the children to hold as the separate estate of their mother, and for her use and benefit. Appellants contend that the children bought the entire 40⅔ percent, that there was no trust in any part of the property conveyed and the interest involved is appellants' property. G. R. Ogletree signed and acknowledged the deed on its date, March 11, 1949, but Mrs. Ogletree, his wife, did not execute it then, in fact, did not do so for several days. She testified she was concerned about whether she would be protected in her ½ of the 40⅔ percent of the deed described as being conveyed. According to her testimony and that of her son and two daughters, Louise and Georgia, she had several conferences with the children on this matter. It was shown that at this time there existed a close family relationship between the parents and the children, all of whom lived there in Austin, except Ben who was operating the lumber company in Polk County. The testimony shows that at a family meeting about March 16th, in order to assure their mother, the children all swore upon the Bible that her one-half interest would remain hers after the deed was executed just as it was before. Even so, the mother was still concerned about her title and mentioned the fact that she had been county clerk of San Jacinto County several years many years before and she became acquainted then with the fact that many times old people conveyed their property to their children or others and were left at their mercy. She showed persistency about the danger of executing such an instrument without obtaining a writing executed in return. According to the testimony of appellees, in order, therefore, to better satisfy their mother the children executed the following instrument:

"State of Texas } Know All Men by These
"County of Travis } Presents:

"We, Ben Ogletree, Ina May McAdams, Georgia Ribar, Louise McElroy, hereby agree that the ownership of the Ogletree Lumber Company is as follows as of this date:

| "Londa Pickett Ogletree | 20.35 per cent |
| "Ben Ogletree | 44.91 " " |
| "Louise McElroy | 11.58 " " |
| "Ina May McAdams | 11.58 " " |
| "Georgia Ribar | 11.58 " " |
| | 100.00 per cent |

"Witness our hands this the 17th day of March, A.D. 1949.

"Ben Ogletree
"Louise McElroy
"Ina May McAdams
"Georgia Ribar."

Several copies of this instrument were signed by each of the parties, and at the time of trial one was held by the mother and another by her daughter, appellant Ina May McAdams. The latter denied that the instrument was executed on the date stated but at some time later in 1949. At any rate, the mother, Mrs. Ogletree, did not sign and acknowledge the deed until March 17, 1949, the certificate of the notary thereto being a joint one showing that Mr. Ogletree reacknowledged it that day also. The testimony of appellees was to the effect that the delivery of the deed to the children and the execution of the above quoted instrument was simultaneous.

G. R. Ogletree died June 29, 1949 and his will giving all of his property to his four children equally in which his wife was appointed executrix was probated in due course.

The operations of the Ogletree Lumber Company had been conducted for some time before his father's death by Ben Ogletree and were principally carried on by him during the course of the events hereinafter to be related, although reports and consultations were held from time to time by him with his sisters and mother. The business did not seem to gather momentum until the year 1951. In that year a division of the income of the business was made, which was allocated to the different partners in accordance with the percentages they then owned. The mother's 20⅓ percent was recognized but the amount coming to her

was applied as payment on her one-half community interest in the $100,000 notes which the children had executed. Similar dispositions of funds of the business were made in the year 1952. During that year appellant Ina May McAdams prepared what was known as the "Red Book". This book reflected the divisions of 1951 and 1952 and gave a breakdown of the different items owing between the different partners and the concerns to which the debts assumed by the children were due. It is a complicated compilation. Some of the figures in these calculations gave credit to Mrs. Ogletree for the percentage which she claims to hold in the business. Contained in the "Red Book" is a page which is entitled "This is Top Secret—and should not be shown to anyone except the immediate members of the family." We quote portions of this page:

"Estate—¼ for each child. This is the 20⅓% which was daddy's. Mother retains her 20⅓%, and in this settlement she is paying her ½ of the indebtedness of the Longhorn and the O & P Grocery. *All* the other debts are being paid by the estate.

"For purposes of clearing this up, each child has been charged with ¼ of the debts, and has been given ¼ of daddy's part of every operation.

"Mother has retained her part of everything that was owned jointly by her and daddy, but she had no part of the estate proper, except that she has been charged with the debts as indicated above.

\* \* \* \* \* \*

"Reference to check numbers, as to the checks we wrote when we had the original settlement, at which time all debts were charged to the Estate which was to include both mother's and daddy's 40⅔%. At the first division, using that method, $12,200 was used which was mother's 20⅓%. This was correct under the system used at that time. Since that time, at each sub-

sequent division, mother has drawn her part, and daddy's part has been used on the debts, taking ½ of it for Ben, and the other ½ being distributed evenly among us girls, and applied on the amount owed us.

"Since now it is being used that mother has her full share, and all the debts are charged to daddy's part; and since the estate of which each of us owns and owes ¼ of all the property and debts; then this method has been used to straighten the whole thing up and find out who owes what to whom.

"I have gone over the entire thing from the first to the last, and these pages are the result. Each person was given a page for what was due them; then a page for what they owed. Each item on the list was given a page— Ogletree Lumber Company, The Estate, Glendale, etc. Then when all charges were completed, each large item was divided up according to the correct ownership for that item, and charges or credits given the partners accordingly.

"I sincerely hope you can understand this. Louise said you all could not understand the method where I had used minus's and plus's. So I am trying this method of credits and charges. The result is the same \* \* but I do want you all to understand it. It is not easy to keep going over this, and over this.

"I cannot figure how this will have to be reported \* \* \* maybe some of you can figure that out. I'm completely figured out. IM."

Later that year appellant Ina May McAdams showed dissatisfaction with the way the lumber company was being operated and she advised the other members of the firm that she wanted to withdraw her interest therein. To effectuate this, on February 1, 1953 her brother, two sisters and mother met at what is known as the

Longhorn Sash & Door Company business in Austin and spent that day discussing and working out arrangements for Ina May to withdraw her interest in the Ogletree Lumber Company. As result of this meeting an agreement was made and executed by appellee Londa Pickett Ogletree and by each of her children. This agreement provided:

"Feb. 1st, 1953.

"Whereas a meeting was called by Ben Ogletree, Ina May · McAdams, Georgia Ribar, Louise McElroy and Mrs. G. R. Ogletree on Feb. 1st, 1953 and the following was agreed upon:

"1. All previous arrangements and decisions regarding the division of property for Ina May McAdams must be disregarded and the following agreement will take its place.

"Various groups of land are to be set up, with North, South, East and West, and Ina will draw one out of each section until she gets enough acres to make 4187 more or less.

"This work was done by everyone concerned and was drawn as follows:

"(See list of land drawn attached)

"2. We agree to give Mother an agreement on her interest in OLC.

"3. We agreed to keep the surveying to a minimum and the cost will be paid ½ by OLC and ½ by Ina May McAdams.

"4. Discussion about division follows: See list of final drawing.

"5. As of Feb. 1st, 1953, all timber cut by Ben on OLC (a) to be deposited in the 1st. State Bank in Ogletree Lumber Company account. Ina May only participate in this account as far as mother's interest that she is holding is concerned. This money will be paid directly to mother.

"6. An account will be opened with the First National Bank, Livingston that will contain all money received for leases, bone yard timber, income from Georgia land, Houston property, etc. Ina May will participate in this just as she did in the old OLC. This account is to maintain a minimum of $1500 at all times. A report is to be made quarterly with disbursements down to $1500.

"7. Fidelity State Bank will maintain an account for the Dolly Varden Lbr Co money and the income for the notes in Livingston (House payments Dabney and Manning). Ina will participate in this as the old OLC account.

"8. The money that the Estate owes Ben through Ina May will be paid as soon as the deeds are signs to the division of the land. She (through estate) will pay Ben $10,634.05 plus adjustment on taxes, etc. She will refigure this and be sure it is correct.

"9. It is agreed that Kelly or Ina can start in the morning, Feb. 2, 1953, to conduct any operation on the portion of land that will be deed to Ina May— that is the portion of lands partitioned to Ina May today by agreement. List on p. 1a of this agreement.

"10. Ina May, Georgia, Louise and Mother agree that the estate owes Ben because of his interest in OLC by the money that was used in projects by daddy, and the money that is due him will be paid him as each division of money is made to equal the portion that is due the estate up to our shares. In other words, percentages will be figured and the money that would be paid to papa if he were living will be paid to Ben on the debt as it comes in (that is, Georgia's, Louise's and Mother's as far as what she owes). The Estate debt to Ben will have already been paid by Ina. Georgia's and Louise's will not.

"11. Mother will pay on the same ratio as Georgia & Louise until her part of the debt is paid.

"12. Everyone understand the above and agrees on same. That is to control our future operations.

"13. It is understood that the right of ingress and egress is agreed upon by all parties on any lands.

"Signed this the 1st. day of Feb. A.D. 1953.

"/s/ Ben Ogletree
"Ben Ogletree
"/s/ Ina May McAdams
"Ina May McAdams
"/s/ Georgia Ribar
"Georgia Ribar
"/s/ Mrs. G. R. Ogletree
"/s/ Louise McElroy
"Louise McElroy"

At the same time there was prepared and executed by each of the three daughters, joined by their husbands, the following instrument to effectuate par. 2 of the basic February 1, 1953 agreement just quoted:

"Feb. 1st., 1953

"State of Texas
"County of Travis
Know All Men by These Presents:

"That we, the members of the Ogletree Lumber Company, regardless of our interest in various portions of land at any time, hereby agree that we, Ben Ogletree, Ina May McAdams, Georgia Ribar, and Louise McElroy are holding in our names for Mrs. G. R. Ogletree an interest equal to one-half of the community property designated at the time of G. R. Ogletree's death to be 20⅓% of all interest in Ogletree Lumber Company.

"Regardless as of the way the interest figures after certain divisions by Ina May McAdams, it will all work out to where Mrs. G. R. Ogletree has an interest as of the death of G. R. Ogletree to be 20⅓%.

"If any of us should die before the death of Mrs. G. R. Ogletree, we want it clearly understood by our successors and assigns that Mrs. G. R. Ogletree's interest that is being held in our respective names belongs to her, and any income from said property is hers.

|  | Ben Ogletree |
| --- | --- |
| "Attest: | Georgia Ribar |
| "Kelly McAdams | Ina May |
| "Ben Royden | McAdams |
| Ogletree | Louise McElroy |
| "Fred J. Ribar | |
| "Ina May | |
| McAdams" | |

In May, 1953, deeds were properly executed by the parties involved, except the mother, carrying out and culminating the arrangement made on February 1st. This effectively severed appellant Ina May McAdams' interest from the business as to the interests in the assets of Ogletree Lumber Company in Texas and in California, essentially the property in litigation, except as to the part appellees claim Ina May was holding in trust for her mother, and except as to Ina May's interest in a company account referred to as the "boneyard account" which was set up to hold properties that were considered of little value or were in litigation; all minerals, also, underlying these lands were left undivided. It should be noted that while, in appellees' view, the mother had 20⅓ percent, ¼th of which was held by each child in trust, when Ina May withdrew her 16⅓ percent from the company, that increased the trust interest in the lumber company held by each child so that Mrs. Ogletree had an interest in Texas property of 5.79 percent and interest in California of 4.82 held by Ina May. According to appellees, Ina May asked her mother at the February 1st meeting to let her take what she was holding for her mother out of the company, but she refused.

Discussions were had between Louise and Ina May and Ben as to how their mother's income from the Ogletree Lumber Company should be reported for income tax purposes; and as result it was agreed between the

children that each of them, as partner, should report ¼th of their mother's earnings in the Ogletree Lumber Company. Louise testified that she had called the Internal Revenue Office and had been advised that this method would appear to be proper. The return, therefore, of each child carried the ¼th interest held by him or her of the mother's income for the previous year. In 1955 Ina May wrote letters to her sister Louise setting forth the amount of income taxes paid by her for her mother for the years, 1951 to 1954. It appears, however, that no refund or payment was made by Mrs. Ogletree to Ina May for the part of the income taxes paid covering her interest until Ina May made an itemized statement showing payment of her mother's proportionate amount of such taxes for the years 1950 to 1957, inclusive, totaling $8,410.01. After such statement was sent, Mrs. Ogletree paid Ina May therefor. In various correspondence and accounts Ina May unquestionably recognized she was holding the percentages of 5.79 and 4.82 for her mother.

However, in the early part of 1958 Ina May began to assert that the 5.79 and the 4.82 percents held by her in the Ogletree Lumber Company was her own individual property and her mother, at best, was entitled to that part of the income from these interests which she desired to take from time to time, and correspondence took place between her and the other children showing her claim thereto. Even so, in her letter to her mother dated March 24, 1958, in reference to the Minor Ranch property in California conveyed by the deed of March 11, 1949, she said:

"The suggestion which we made in the letter was to try to handle your part which we have in our name fairly and honestly. It was not to try to keep you from getting your part. At any time you could have used your bonds, or not, as you preferred. They would have been yours.

"I am perfectly willing to deed back what I have in my name; and I think

all the others are, also, I just wonder if you know what will be involved when you make us do this."

However, on Sunday, April 12, 1959, appellant Ina May wrote to her sister Georgia advising that she was having her attorney file suit on Tuesday following to recover the interests involved. This letter propelled the controversy into court. Up to this time in all the dealings of the parties with each other no lawyer was consulted or prepared any of the instruments mentioned. Upon trial to a jury much evidence upon the issue of title was introduced. The verdict of the jury was in favor of appellees upon all eleven issues submitted to it. These findings are fairly summarized in appellees' brief as follows:

"1. That prior to or contemporaneously with the delivery of the 1949 deed by the father and mother, the Defendant Ina May McAdams had orally agreed that she and her brother and sisters would jointly take and hold in trust for the mother's sole and separate use and benefit, an undivided ½ of the community interest theretofore owned by the father and mother in the properties and assets of the company.

"2. That a confidential relationship then existed between the parents and Ina May.

"3. That the confidential relationship was such that the parents believed they could rely on her to comply with her agreement.

"4. That they did so rely.

"5. That they would not have delivered the deed if she had not so agreed.

"6. That by written instrument or instruments signed and delivered by her, Ina May had declared in effect that she and her brother and sisters were taking or had taken and were holding in trust for the mother's sole and separate use and benefit an undivided ½ of such community interest.

"7. and 8. That all of the 5.79% interest Ina May retained in certain lands in Polk and San Jacinto Counties, Texas, and all of the 4.82% interest she retained in certain lands in California, by the terms of certain 1953 partition deeds with the other children were parts of the interest agreed by Ina May to be held in trust for the mother.

"9. and 10. That by written instrument or instruments signed and delivered by her, Ina May had declared in effect that such 5.79% interest and 4.82% interest were being or had been retained by her and were being held by her in trust for her mother's sole and separate use and benefit.

"11. The jury refused to find that the mother's ownership was limited to the right to the income from the property so long as she might live."

Judgment was rendered in behalf of appellee Londa Pickett Ogletree upon said verdict establishing an express trust and a constructive trust in the lands involved, and granting her judgment for the lands and as to the California lands, ordered appellant Ina May McAdams and husband to make deeds of the interests involved to Appellee Londa Pickett Ogletree.

■ The first complaint made by appellants is that the answer of the jury to Special Issue No. 1, finding that appellant Ina May McAdams orally agreed that she and her brother and sisters would jointly take and hold in trust for the benefit of their mother ½ of the interest conveyed by the March 11, 1949 deed is against the overwhelming weight and preponderance of the evidence. We have read the voluminous record, and are satisfied that the complaint is without merit. Appellees, Mrs. Ogletree, Ben, Louise and Georgia, each testified at length that such an agreement was made at the time the conveyance was delivered. While Mrs. Ogletree, in her deposition, stated that this property would be hers for life, we attach no special

significance thereto since she was, at the time her deposition was taken, at least 75 years of age and the legal distinctions probably meant little to her. When G. R. Ogletree's will was probated Mrs. Ogletree, as executrix, reported the conveyance of the property by the deed of March 11, 1949, and stated that the consideration paid for the land was a full and adequate consideration. However, the government revalued the entire property described in the deed at $376,036.75. The difference between the sales price $259,818 and the assessed value was divided one-half to Mr. Ogletree's estate and one-half to the widow. A gift tax was paid ½ by the estate and ½ by Mrs. Ogletree. As executrix, she executed gift tax returns upon forms furnished by the government, and appellants contend that in the forms Mrs. Ogletree made statements that "no trust" was created by the deed. We have carefully read the answers given on these forms and do not agree that she represented "no trust" was formed by the deed. She did, in effect, say in one such answer that no trust in the property was formed for the benefit of a person or persons "other than yourself." This does not militate against appellees' present position. It is true Ina May denied that she had any particular conferences with her mother, brother and sisters during the time and circumstances involved in the execution of the deed, and that she ever swore on the Bible that she would hold her mother's interest in trust for her, but the jury has resolved the dispute and we affirm it. The testimony of appellees that such trust arrangement was made was, in our opinion, clear, concise and convincing. We say this apart from the above records quoted, and when reinforced by them we can hardly see how the jury could have reached any other conclusion.

■■ On this basis, the jury found both an oral trust and a trust declared by written instruments and the court rendered judgment thereon. The appellants assert in this the court erred, and argue that there can no longer be, since the passage of the

Texas Trust Act in 1943, Vernon's Ann.Civ. St. art. 7425b–1 et seq., an oral express trust of realty in this State. Under the finding of the jury that an express trust was created in writing, we are entitled to conclude that the agreement dated March 17, 1949 was executed on that date, the date of delivery of the deed; and the subsequent writings offered in evidence explain and support this trust. It is argued that since appellant Ina May McAdams was married at the time of these transactions, unless her husband joined her therein, she cannot be bound by her actions. But a married woman may be a trustee. If at the time the conveyance was made to her she accepts the instrument as trustee she must recognize her obligation, although not joined by her husband. Frint v. Tate, Tex.Civ. App., 162 S.W.2d 737. It has also been held that a subsequent acknowledgment of trusteeship is sufficient. Wallace v. Pruitt, 1 Tex.Civ.App. 231, 20 S.W. 728; Pyron v. Brownfield, Tex.Civ.App., 238 S.W. 725. Such a declaration by trustee would seem to satisfy Art. 7425b–7 of the Texas Trust Act. Although the subsequent writings do not speak expressly of a trust, they are sufficient. Pp. 293, et seq., Sec. 45, 1 Bogert on Trusts. And since the daughters each had their disabilities of coverture removed prior to 1953, their acts in connection with the business of Ogletree Lumber Company is binding upon them.

But whether we are right in holding an express trust was established, sufficient to satisfy the Texas Trust Act, we are satisfied that the trial court correctly declared a constructive trust to exist upon the issues found by the jury. The jury found that at the time Ina May agreed to act as trustee there was a confidential relationship existing between the parents and Ina May and that the parents believed that they could rely on her to comply with her agreement; that they did so rely and would not have delivered the deed unless she had so agreed. She repudiated this agreement. We think under these facts a constructive trust was proven and re-investing title to the trust property in Mrs. Ogletree was the proper relief. Omohundro v. Matthews, et al., Tex.Sup., 341 S.W.2d 401; Mills v. Gray, 147 Tex. 33, 210 S.W.2d 985; Wilson v. Therrell, Tex.Civ.App., 304 S.W.2d 723; Mathews v. Mathews, Tex.Civ.App., 310 S.W.2d 629.

■ But if the object of the deed as to Mrs. Ogletree's ½ interest was to create a trust for her, appellants assert that since this was done to evade payment of taxes, it is against public policy and therefore void. The evidence of both Ben and Louise was undoubtedly to the effect the children had a tax saving in mind in obtaining the deed since the property of the mother would not be listed in her estate at her death. However, Ben also gave as a reason for the conveyance that the children could better manage the business if the properties were in the children's names. He testified: "My mother was elderly and unable to participate actively in the operation of the business." And further " * * * that since she was not able to participate actively in it, it would be better that those of us who were active and trying * * * able to do and were doing, would hold for her and act for her in that capacity." And he said on cross-examination:

"Q. Oh, the idea was, then, that you could do better to manage the property than she could and that you were putting it in your names so you could manage it for her? A. We did attempt to do that. We put it in our names and we did do the managing of it, on that that we held for her.

"Q. Why could you not have managed it, regardless of who was shown to be the legal owner of it? A. We thought it would be better the way we did.

"Q. Why? A. We were more active and more able to do it, and also, like I say, there was—we figured there would be a tax advantage. It had been pointed out to us. The way we did

or tried to do, we thought, should be better from an estate tax standpoint."

The testimony of Mrs. Ogletree only once touched the question of taxes, as follows: "Now, Mrs. Ogletree, do you recall the circumstances under which this deed of March 11, 1949, was executed? * * * Would you tell the Jury under what circumstances that that deed was signed by you and Mr. Ogletree? A. Mr. Ogletree signed it because—something about taxes. I don't have to go into that when I don't remember it very well, I'm sure, but it was something about saving on taxes, and I signed it—." This is not sufficient to charge her with a fraudulent or illegal purpose of evasion of estate taxes, which, after all, she herself would in no event have to pay, and which had not accrued. Rivera v. White, 94 Tex. 538, 539, 63 S.W. 125 (126); Kirkland v. Handrick, Tex.Civ. App., 173 S.W.2d 735. There is not a scintilla of proof that any income or other taxes had been evaded by the arrangement created by the deed, and the judgment rendered by the trial court makes the family trust a matter of record which may greatly aid tax collecting authorities in collecting those taxes that may accrue on the death of the owner. It may also be added that no affirmative defense setting up this issue was pleaded nor issue asked to the jury thereon, and if such a fact issue could exist the trial court, by its judgment, has resolved the issue in favor of the appellees. Rule 279, Texas Rules of Civil Procedure.

■ It is claimed that the trial court erred in admitting extrinsic evidence of the trust to vary and contradict the terms of the deed of March 11, 1949. Several cases are cited upon the rule that where a contractual statement of consideration in a deed exists, or where a deed contains a provision that it is to one's separate estate, the terms of the deed may not be varied by parol evidence. The deed in the instant case neither set forth a contractual consideration nor provided that it was to any-

one's separate use and benefit. The case of Mills v. Gray, supra, upholds the action of the trial court.

■ Complaint is also made that if there is a trust it would be only as to the ½ of the community property owned by Mrs. Ogletree and that therefore not only the ½ of the community which was sold outright but ½ of the other ½ vested in the four children by virtue of G. R. Ogletree's will. But when G. R. Ogletree executed the deed he did so, as the jury in effect found, conveying ½ of the community to the children upon an onerous consideration and gave the other ½ to the children as trustees for the use and benefit of the mother. Mr. Ogletree could have conveyed an undivided ½ of the community directly to his wife—instead he conveyed it to trustees for her benefit. A conveyance by the husband, either directly to or for the benefit of the wife makes the property conveyed her separate estate. Even if Mr. Ogletree had not consciously realized he was conveying the undivided ½ interest for the benefit of the wife's separate estate, the legal effect is the same and the trust a valid one. Frint v. Tate, supra.

■ Appellants contend the court erred in failing to render judgment for Ina May McAdams because her mother has by her declarations and admissions made during the trial and through the years since March 11, 1949 recognized and bound herself to the record title and estate of Ina May Mc-Adams; and that the mother cannot, in good conscience and with clean hands under the circumstances, urge a beneficial estate in herself as to the lands in suit. Much of the record has already been summarized in the earlier part of this opinion, and we will not do so again. Besides the 1949 deed, and gift tax returns, already commented upon herein, appellants introduced in evidence 14 deeds, easements and other legal documents which were executed between 1950 and 1958, all of which refer in some manner to the four grantees in the 1949 deed as being the owners of the land

affected (part of the Ogletree Lumber Company land included in the 1949 deed). There are also four pleadings filed by these same four grantees in various suits reciting sole ownership of some part of these lands conveyed to them in 1949. For example, one petition filed by Ben Ogletree, Louise McElroy and Georgia Ribar along with Mrs. McAdams told the Court in 1952 that the "individual partners" named were "the sole owners of an undivided one-half interest in the two hundred acres of land hereinafter described." And in 1959 the four grantees in the 1949 deed alleged in another suit that their father had conveyed his interest to them in the tract affected and that the plaintiffs or their predecessors in title "were seized and possessed of the following land and premises situated in Polk County, Texas, holding and claiming the same in fee simple * * *" Appellants also put in evidence appellee Londa Pickett Ogletree's original petition in the present suit which failed to allege any trust in the lands in her behalf. Because of these items of evidence appellants assert appellee Mrs. Ogletree is estopped to recover the lands.

■ Let us examine this contention. Though the terms of the 1949 deed are explicit, it has already been shown that parol evidence was admissible to show the trust. The gift tax returns executed by Mrs. Ogletree did not, as pointed out above, represent that "no trust" was created. As for the 14 deeds and easements, they were executed by the four children as a part of the business of the Ogletree Lumber Company, as the acts of that company. Mrs. Ogletree is not attacking the validity of the rights thereby conveyed. Nor is she raising any question as to any right accruing to any person under any of the suits filed by the children for the company. Nor could it be said that Ina May was misled by any of these instruments in which she so participated. This is not the first instance of a partnership with a dormant partner. And there is nothing in these proceedings that may not happen many times over in the business world of partnerships for one reason or another. The original petition offered in evidence was an abandoned pleading and was filed under pressure of shortness of time. While all the instruments were admissible upon the issue of title, we fail to see how estoppel on account of them applies against the mother in this suit. Omohundro v. Matthews, et al., supra.

To discuss each of appellants' many points would unduly extend this already long opinion. We have discussed the ones appearing to have strength; all have been carefully considered and they are without merit.

The judgment is affirmed.